MAX N. TOBIAS, JR., Judge.
1 ;The defendant, Cash Control Systems, L.L.C. (“CCS”), appeals the 13 December 2013 judgment rendered by the First City Court of the City of New Orleans in favor of the plaintiffs, Maritza Hyde and Andrew Hyde, individually, and on behalf of Escoh-yde, Incorporated d/b/a Pepperoni’s Café (collectively hereinafter, “the Hydes”), denying the relief sought by CCS in its petition to annul judgment. For the following reasons, we affirm.
La. C.C.P. art. 2004 A provides that “[a] final judgment obtained by fraud or ill practices may be annulled.” This appeal presents the issue of whether an attorney’s failure to give notice to counsel for the opposing party of his intent to confirm a judgment against the opposing counsel’s client constituted an ill practice as contemplated by article 2004.[1] At the time the judgment was rendered, counsel for the opposing party had not formally enrolled as counsel of record in the litigation, filed a formal request for extension of time on behalf of his client, or made any appearance of record in the proceedings. After *10 considering the law and evidence submitted at the hearing on CCS’s petition to annul the judgment, the trial judge determined that, under the facts and circumstances presented, that the factions of the plaintiffs’ attorney did not constitute an ill practice under the provisions of La. C.C.P. art. 2004. We agree.

Facts and Procedural History

This litigation originated as a breach of contract action involving the sale and installation of certain computer systems filed by the Hydes against CCS. On 31 December 2010, the Hydes entered into a written contract with CCS whereby CCS agreed to install a computer system at Pepperoni’s Café.[2] The Hydes purchased the computer system for purposes of assisting them in the day-to-day operations of the restaurant. After paying to CCS the contract price of $9,678.11, CCS installed the system. According to the Hydes, the computer system never properly fúnctioned in the capacity, or for the purposes, for which it was purchased.
The Hydes contend that, after months of repeatedly requesting CCS to remedy the computer system’s shortcomings to no avail, they retained an attorney, Mr. Leon H. Edmond, IV (“Mr. Edmond”), to assist them. Mr. Edmond sent a letter to CCS through its sole member, Melvin J. Ziegler, Jr., dated 15 December 2011, requesting a refund of the purchase price in exchange for the return of the system. The record reflects that this letter was received by Mr. Ziegler on behalf of CCS on 19 December 2011. It is undisputed that CCS did not respond to the letter.
Three months later, on 15 March 2012, having received no response from CCS, Mr. Edmond filed suit for breach of contract against CCS on behalf of the |aHydes in the First City Court. The record reflects that personal service of the petition was made upon CCS through Melvin Ziegler, its sole member, on 21 May 2012.[3] In response, CCS obtained counsel, Mr. Neal J. Favret (“Mr. Favret”), who, on 5 June 2012, conducted a telephone conference with Mr. Edmond. In that conference, Mr. Edmond agreed to grant CCS an informal extension of time within which to file responsive pleadings and to refrain from taking any action adverse to the interests of CCS without providing advance notice to Mr. Favret in order to allow him the opportunity to protect CCS’s interests. The agreement was memorialized in a letter drafted by Mr. Favret and sent by facsimile transmittal that same date to Mr. Edmond. This is the only written communication emanating from CCS to the Hydes, through counsel, contained and/or referenced in the record.
After the passage of áix weeks, on 18 July 2012, counsel for the parties had a telephone conference wherein it was agreed that the parties would meet during the week of 30 July 2012 to discuss possible resolution of the matter.[4] Following the telephone conference, Mr. Edmond followed up with an email dated 18 July 2012 directed to Mr. Favret confirming the parties’ agreement to meet. The record is devoid of any response, written or otherwise, by Mr. Favret to the email. Consequently, no potential dates were provided and no meeting between the parties ever occurred.
|4On 2 August 2012, Mr. Edmond sent a letter by facsimile transmission to Mr. *11 Favret reminding of their previous agreement to schedule a meeting with his client; the letter stated in pertinent part:
I hate to be a bother; but, my client was forced to file a petition to attempt to get your client’s attention as he did not respond to the letter that I sent to him certified on December 15, 2012 and he received on December 19, 2012. Now he has been served and is acting as if he just needs the chance to speak when he has had the chance since December 19th. I have opened the door for him to convey his side of the story and he has not accepted my invitation.
The letter further conveyed Mr. Edmond’s desire to schedule a status conference in order to obtain discovery deadlines and an agreeable trial date. It is undisputed that Mr. Edmond received no response to the letter from either Mr. Favret or CCS.
When Mr. Edmond attempted to file a motion on behalf of the Hydes to set the matter for trial, he was prohibited from doing so because no answer or other pleading had been filed on behalf of CCS.[5] Consequently, having received no response to any attempts to move the matter forward, on 19 September 2012, Mr. Edmond facsimile transmitted a letter to Mr. Favret revoking the informal extension of time previously granted to CCS and included the following:
This withdrawal has become necessary due to your client’s non-responsive attitude that has been the tone and theme of this case. I await any response that you may have in this matter.
| .^Notwithstanding receipt of this letter, CCS failed to file an answer or other responsive pleading and failed to respond in any manner thereto.[6] Thus, after the passage of twenty-seven days, on 16 October 2012, counsel for the Hydes proceeded, procuring a judgment against CCS. The record contains a certificate filed by the clerk certifying that on the same day the judgment was obtained, a notice of judgment was mailed by the court to CCS at the address upon which service of the original petition had been perfected pursuant to La. C.C.P. art. 1918 C, D.[7]
Despite having been served with the notice of judgment in or about October 2012, no action was taken by or on behalf of CCS until exactly one year later, on 16 October 2013, when CCS filed the petition to annul judgment, which was denied on 13 December 2013. It is from this judgment that CCS timely appealed.
*12 On appeal, Mr. Favret argues that the judgment Mr. Edmond procured constituted an “ill practice” as contemplated by La. C.C.P. art. 2004, because it was obtained without Mr. Edmond providing prior notice to him of his intention to obtain the judgment against CCS. Accordingly, CCS argues that the trial court erred in denying its petition to annul judgment.
| fiStandard of Review
“Trial courts are permitted discretion in deciding when a judgment should be annulled because of fraud or ill practices, to which discretion reviewing courts will defer.” Power Marketing Direct, Inc. v. Foster, 05-2023, p. 11 (La.9/6/06), 938 So.2d 662, 670; Duckworth Properties, L.L. C. v. Williams, 10-0244, p. 2 (La.App. 4 Cir.' 11/24/10), 52 So.3d 287, 289. Our courts examine each case from an equitable viewpoint to “ascertain whether allowing the judgment to stand would be inequitable or unconscionable,” considering the practice by which the party was able to obtain the judgment. Duckworth Properties, p. 2, 52 So.3d at 289.

Law and Discussion

As noted above, a final judgment obtained by fraud or ill practices may be annulled. La. C.C.P. art. 2004 A. As a preliminary matter, we note that an action for nullity is not properly filed as a summary proceeding as was done by CCS in this case. The law requires that an action for nullity pursuant to La. C.C.P. art. 2004 must be brought in a direct action,[8] rather than a summary proceeding.[9] See Gazebo, Inc. v. City of New Orleans, 97-2769, pp. 7-8 (La.App. 4 Cir. 3/23/98), 710 So.2d 354, 358. Summary proceedings may be used only in those matters in |7which the law permits them to be used. La. C.C.P. art. 2592.[10] No authority in law exists to bring an action to annul a judgment for fraud or ill practices in a summary proceeding. Thus, the party praying for the nullity of judgment alleging fraud or ill practices pursuant to article 2004 must bring his action by means of a petition, and the adverse party must be cited to appear, as in ordinary suits. Knight v. Sears, Roebuck & Co., 566 So.2d 135, 137 (La.App. 1st Cir.1990); see La. C.C.P. art. 1201.
While CCS’s pleading filed in the instant case was captioned “Petition for Nullity of Judgment,” CCS set the matter for contradictory hearing as a motion to show cause. At the hearing, both sides argued and offered evidence on the merits and the trial judge, thereafter, summarily decided the case on its merits. An action for nullity is an ordinary proceeding and should not be summarily determined on a motion (rule), as was done in the instant case. See Ezzell v. Miranne, 13-349, p. 8 *13 (La.App. 5 Cir. 12/30/18), 131 So.3d 1093, 1098.
Nevertheless, a dilatory exception asserting the unauthorized use of summary proceedings to attack the judgment would have been the proper procedure for contesting CCS’s filing of its petition to annul and setting it for contradictory hearing. However, a dilatory exception to a rule to show cause must be filed prior to the time assigned for trial of the rule or it is deemed waived. La. C.C.P. arts. 926, 928 and 2593. Here, the Hydes made no objection to the form of the proceeding in the trial court and, thus, waived any right to object to the improper summary proceeding.
|sIn determining whether a judgment has been obtained by actionable fraud or ill practices, it must be shown that: “(1) the circumstances under which the judgment was rendered showed the deprivation of legal rights of the litigant seeking relief, and (2) the enforcement of the judgment would have been unconscionable and inequitable.” Duckworth Properties, p. 2, 52 So.3d at 289, quoting Johnson v. Jones-Joumet, 320 So.2d 533, 537 (La. 1975). La. C.C.P. art. 2004 is not limited to cases-.of actual fraud or intentional wrongdoing, but is sufficiently broad to include situations where:
[A] judgment is rendered through some improper practice or procedure which operates, even innocently, to deprive the party cast in judgment of some legal right, and where the enforcement of the judgment would be unconscionable and inequitable.
Russell v. Illinois Cent. Gulf R.R., 96-2649 (La.1/10/97), 686 So.2d 817, 819, quoting Kem Search, Inc. v. Sheffield, 434 So.2d 1067,1070 (La.1983).
In the case at bar, counsel for CCS argues that, while Mr. Edmond’s 19 September 2012 letter withdrew the previously granted extension of time within which CCS had to file responsive pleadings, the letter (1) made no reference to his withdrawing the prior agreement to notify counsel prior to taking any actions adverse to CCS, and (2) was devoid of any notice of his intention to obtain the judgment against CCS. According to CCS, the failure of Mr. Edmond to give notice to its counsel prior to obtaining a judgment against constituted an ill practice, which effectively deprived CCS of its legal right to assert defenses to the Hydes’s claim for breach of contract. CCS further contends the trial court’s refusal to annul the judgment was erroneous because its enforcement would be both unconscionable and inequitable. To support its position, CCS cites Kem Search, supra, and Russell, supra, where the failure of counsel to give notice prior to ^taking a default and confirming the default was the decisive factor in annulling the judgments on the ground that such failure to give notice constituted an ill practice.
CCS’s reliance on Kem Search and Russell is misplaced, however, because this case sub judice differs factually: in both of the cases, the Louisiana Supreme Court determined that it was an ill practice for an attorney to obtain a default and confirm the default without attempting to notify the opposing attorney when the opposing attorney had actively participated in the litigation proceedings and the defendants were actively attempting to defend their rights. Kem Search, 434 So.2d at 1070;[11] *14 Russell, pp. 2-3, 686 So.2d at 819.[12] To the contrary, under the facts and circumstances presented here, we find that CCS was not actively participating in or attempting to defend or protect its rights in this litigation at all.
The evidence establishes that as early as 19 December 2011, approximately ten months prior to obtaining the judgment, the Hydes, individually, and then |;pthrough their attorney, Mr. Edmond, attempted to get CCS, individually, and then through its attorney, Mr. Favret, to respond to their complaints of dissatisfaction with the computer system it installed, all to no avail. When the Hydes’s certified letter directed to the owner of CCS requesting relief went ignored, after three months, the Hydes filed suit in March 2012. Though CCS retained counsel, who did contact the Hydes’s counsel in June 2012 and obtained an informal extension of time, in addition to an agreement that no adverse action would be taken against CCS without prior notice, the communication from that point forward remained virtually one-sided.[13] Emails and letters to Mr. Favret from Mr. Edmond fell on deaf ears, yielding no response. In yet another ill-fated attempt to move the matter forward, the Hydes’s counsel sought to set the case for trial and obtain discovery deadlines, but was unable to do so because CCS counsel had failed to file an answer in the matter or to otherwise make an appearance in the lawsuit. Finally, on 19 September 2012 — having received no response from CCS’s attorney for two months — counsel for the Hydes faxed a letter to CCS’s attorney revoking the previously granted informal extension of time within which to respond to the lawsuit. Though Mr. Edmond did not expressly revoke his former agreement not to take any adverse action against CCS without first giving CCS notice of his intention to do so, once the extension of time was revoked, pursuant to La. C.C.P. art. 4903, CCS had ten days within which to formally appear and file an answer or other responsive or appropriate pleading. Instead, counsel for CCS took no action whatsoever nor participated further. Consequently, a *15 judgment was obtained on [^behalf of the Hydes twenty-seven days after the motion for extension had been withdrawn.
At the hearing on CCS’s petition to annul judgment, the trial judge noted that CCS “could have filed an extension of time and [the Hydes] wouldn’t have been able to come in and take a default. But you literally did nothing in the record.” [Emphasis supplied.] A recitation of the proceedings, in part, is telling:
THE COURT:
The withdrawal of the extension, how much time lapsed between the time you get the letter, because isn’t it — what is the date?
MR. FAVRET:
September 19th.
THE COURT:
September 19th?
MR. FAVRET:
And in less than 30 days later, he takes a default judgment. He had to have applied with Your Honor to get the hearing.
THE COURT:
Well, you only have 15 days to answer.[14] So you almost got doubled [sic] the amount of time, right, after he withdrew the extension on September 19? MR. FAVRET:
That is true, Your Honor.
THE COURT:
And the default isn’t taken until almost 30 days later.
MR. FAVRET:
Less than 30 days later. It was actually — the hearing was taken — so I would submit that—
THE COURT:
hi>So you still got — even after he withdrew it, he still gave you 15 days, is that correct?
MR. FAVRET:
He did, Your Honor.
THE COURT:
Okay.
MR. FAVRET:
Nevertheless, he had an - agreement with counsel that he would notify counsel prior to taking any adverse actions. That did not happen. That was not withdrawn. The extension of time was withdrawn. We had two agreements in that letter of June 5th, Your Honor, one that he would give us an extension of time and—
THE COURT:
I guess I’m not understanding. If you don’t have an extension, what do you think happens?
MR. FAVRET:
I thought that because of the agreement—
THE COURT:
What do you think the significance of not having an extension is? There is no extension of time to answer. So to you, what is the significance of that?
MR. FAVRET:
The significance of that is that he could file a default judgment. However, Your Honor, we specifically attempted to guard against that by saying, counsel, please let us know you agreed not to take part in any adverse action—
THE COURT:
You would guard against that by enrolling in the record. It is free to file a motion for extension of time.
MR. FAVRET:
*16 I understand that, Your Honor, I do. THE COURT:
It is free to file a motion to enroll.
MR. FAVRET:
|1SI understand completely.
THE COURT:
I would not have let them proceeded [sic] if either one of those things were in the record, but they weren’t.
MR. FAVRET:
I completely understand, Judge. And the Louisiana Supreme Court’s quoting in Chemsearch [sic] clearly says that they could have taken other more prudent steps. But the fact that they did not still does not negate the fact—
THE COURT:
But that still doesn’t mean that it rises to the leve [sic] of fraud or ill practice.
MR. FAVRET:
Your Honor—
THE COURT:
It could not be nice, but that is not ill practice.
MR. FAVRET:
Your Honor, I completely understand. THE COURT:
There’s a line between not nice and ill practice.
MR. FAVRET:
I completely understand. And I’m not here saying that he intentionally defrauded us. I’m not saying that the court intentionally did anything wrong. What I’m saying is exactly that Chem-search [sic] says, which is these actions, even if they innocently deprive a litigant of the chance to set forth these defenses — even if they could have done something more prudent, Your Honor, the agreement was that they would notify us prior to doing exactly what happened.
THE COURT:
The only reason you’re in here now is because they filed a judgment debtor rule. Even after your client gets served with a notice of judgment, nothing happens.
MR. FAVRET:
And curiously, Judge, the only notice that we have of the judgment was when counsel calls us 84 days after the appeal delays have run to notify us that there was a |udefault judgment taken. We couldn’t appeal this. We had to file a petition to annul.
THE COURT:
Because you didn’t enroll, it wouldn’t have gone to you. It went to where the original service was.[15] MR. FAVRET:
I understand that, Judge. We had an agreement in place between counsel. And the fact that he did not notify us knowing that we represented Cash Control Systems — judge, we had conversations in June, in July, in August and in September. There were communications between counsel.[16]
*17 THE COURT:
And so how long do you think he should wait for you to get involved?
Based upon a thorough review of the record before us, and after consideration of the facts presented and applying the law to those facts, unlike Kem Search, supra, and Russell, supra, we find no evidence that CCS was unfairly deprived of an opportunity to present its defenses in this case. To the contrary, we find that CCS simply chose not to take any action to protect the potential loss of its rights. Though counsel for CCS wrote one letter and participated in two phone calls over a period of four months, we cannot say and do not find that CCS or its attorney was actively participating in the litigation proceedings or was actively involved in attempting to protect CCS’s rights and/or defenses. Accordingly, we do not find that the Hydes’s attorney employed fraud or ill practices to obtain the | ^judgment against CCS or that enforcement of the judgment would be either unconscionable or inequitable under the circumstances presented in this case.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. Unlike judgments in district court where a default is entered and the default confirmed two or more days later, no default (erroneously referred to as a preliminary default) is required in a city court. La. C.C.P. art. 4904 A.; cf. La. C.C.P. art. 1701, etseq.

. A copy of the contract is not contained in the record on appeal.

. See La. G.C.P. art. 1266 B(l); R.S. 12:1308; La. R.S. 12:1311.

.It is unclear from the record who initiated this telephone conference.

. See City of New Orleans, First City Court, Rule 10, § 4(c).

. La. C.C.P. art. 4903 provides that in matters pending in parish and city courts, ‘‘[t]he defendant shall answer within ten days of the service of citation.”

. La. C.C.P. art. 1913 provides, in pertinent part:
C. Notice of the signing of a default judgment against a defendant on whom citation was served personally, and who filed no exceptions or answer, shall be mailed by the clerk of court to the defendant at the address where personal service was obtained or to the last known address of the defendant.
D. The clerk shall file a certificate in the record showing the date on which, and the counsel and parties to whom, notice of the signing of judgment was mailed.
According to the record, service of the breach of contract petition filed by the Hydes was made personally upon CCS through its sole member, Melvin J. Ziegler, Jr., at his address in Kenner, Louisiana. The record further confirms that, because no answer or exceptions had been filed into the record and no formal appearance by Mr. Favret (or any other lawyer) on behalf of CCS had been entered, in accordance with La. C.C.P. art. 1913C, the clerk mailed the notice of the signing of the judgment to Mr. Ziegler at this same Kenner address.

. A "direct action” means that the party praying for the nullity of judgment must bring his action by means of a petition and the adverse party must be cited to appear. Lowe's Home Const., L.L.C. v. Lips, p. 5 (La.App. 5 Cir. 1/25/11), 61 So.3d 12, 16. The action for nullity need not be filed in a new proceeding with a different number, but rather, can be filed in the same case which produced the offending judgment. Gazebo, Inc. v. City of New Orleans, 97-2769, p. 7 (La.App. 4 Cir. 3/23/98), 710 So.2d 354, 358.

. The Official Revision Comment (d) to La. C.C.P. art. 2004 states: No specific provision has been made regarding the manner of asserting the grounds of nullity in the above article. This was thought unnecessary in view of the established jurisprudence to the effect that such grounds must be asserted in a direct action and cannot be raised collaterally. (Citations omitted).

.Those matters in which summary proceedings may be used are set forth in La. C.C.P. art. 2592.

. In Kem Search, a suit on an open account, a judgment confirming a default was entered in favor of the seller. The buyer filed a petition to annul the judgment, which was denied by the trial court. The appellate court affirmed. On writs, agreeing that the defen *14 dant could have more prudently protected his rights by filing responsive pleadings to the petition, the Court concluded that the enforcement of the judgment was nevertheless unconscionable because the defendant failed to act due to his mistaken and not unreasonable impression that the plaintiff would give him an opportunity to file pleadings if his settlement overtures were rejected. A "mis-communication between the parties” resulted in a deprivation of the buyer’s legal rights. Kem Search, 434 So.2d at 1071. The Court further observed that the Kem Search attorney’s confirmation of the default without giving prior notice constituted an ill practice under the circumstances of the case, i.e., where the defendant was actively involved in attempting to protect his rights in the litigation, and thus, entitled the defendant to have the judgment annulled. Id. at 1072.

. In Russell, the Court held that it was an ill practice for the plaintiff's attorney to confirm a default without attempting to notify the opposing attorney when the opposing attorney had participated in the litigation proceedings and inadvertently failed to file an answer to the plaintiff's second amended petition. The case involved a petitory action, wherein litigants intend to assert their respective rights to the property involved. The Court held that “[ujnder these circumstances, we find the action of the Plaintiff’s attorney in this case does constitute an ill practice under La.Code Civ.P. art. 2004.” Russell, p. 2, 686 So.2d at 819 [Emphasis supplied]. Thus, the Court found it was an ill practice for an attorney to obtain a judgment without attempting to notify the opposing attorney when the opposing attorney had participated in litigation proceedings and the defendants were actively attempting to defend their rights. Id.

. The record reflects that a telephone conference between counsel took place on 18 July 2012; it is unclear which party initiated that conference.

. Pursuant to La. C.C.P. art. 4903, the actual delay for filing an answer in First City Court is within ten days of the service of citation.

. The record confirms that a notice of the judgment was mailed by the clerk to Mr. Ziegler on 16 October 2012 in accordance with La. C.C.P. art. 1913(C); notice of judgment was sent by the court to CCS at the address where personal service of the petition had been made. No action — not a phone call or a letter — was taken by CCS or its counsel until one year to the date later on 16. October 2013, the date the petition to annul judgment was filed.

. Counsel for CCS would have this court believe that counsel for both parties participated in those communications that took place in June, July, August and September, but the record belies his assertion. The only communications that took place between the parties occurred in June and July. Thereafter, the communication was one-sided being originated by the Hydes's attorney.